# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSE RIVERA, | : |
| Petitioner, | :     Civ. No. 12-2949 (KM) |
| v. | :     **OPINION** |
| CHARLES WARREN, et al., | : |
| Respondents. | : |

**KEVIN MCNULTY, U.S.D.J.**

## I.    INTRODUCTION

Petitioner, Jose Rivera, is a state prisoner currently incarcerated at the New Jersey State Prison in Trenton, New Jersey. Mr. Rivera was found guilty by a jury of first-degree murder and third-degree hindering apprehension by attempting to conceal the victim's body. He is currently serving a life sentence of imprisonment with a thirty-five year parole ineligibility. Now before the Court is Rivera's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition raises four claims:

1. Ineffective assistance of counsel;

2. Violation of Article 36 of the Vienna Convention on Consular Relations;

3. Violation of his right to testify on his own behalf; and

4. All of Rivera's statements should have been suppressed.

For the following reasons, the habeas petition will be denied. I discuss Claim Claim 3 immediately after Count 1, to which it is closely related.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

The victim, Amalia Rojas, and defendant were married in Mexico in 1983. According to the adult presentence report, three children were born of the marriage. The oldest child resides in Astoria Queens, and the two youngest reside with an aunt in Mexico. In the mid-nineties, Amalia and the children emigrated to the United States, and defendant joined the family in the late nineties.

During September 1998, the timeframe of the murder, defendant, Amalia, and the two youngest children resided in one room of a basement apartment in Queens that they shared with Amalia's seventeen-year-old nephew, Armando Rojas, and a man named David Alvarez. Amalia had married Alvarez after her arrival in the United States.

On Sunday, September 13, 1998, Amalia and defendant left the apartment together, but when defendant returned to the apartment at about 6:00 p.m. that evening, he was alone. He told Armando Rojas that he and Amalia had gone to 42nd Street in New York City, and that "she had gone into the bathroom and hadn't come out."

On Monday, September 14, 1998, at about 7:00 a.m., Pedro Soto arrived for work at the Gilmont Industries distribution warehouse located at 738 Schulyer Avenue in Lyndhurst, New Jersey. After lunch, as part of his duties, Soto drove a forklift to the back of the building in order to retrieve a container. While in this area, Soto noticed "the legs" sticking out from between the building and a 36 x 26 x 24 inch shipping container. When Soto moved a blue plastic container lid that was partially covering the body, he observed an unknown dead woman. Immediately thereafter, Soto notified the police.

---

[1]     This factual background is taken from the New Jersey Superior Court, Appellate Division opinion on Mr. Rivera's direct appeal, filed August 23, 2007. (*See* Dkt. No. 10-3.)

Sergeant Brian Callanan of the Bergen County Prosecutor's Office (BCPO) was one of the officers who responded to the scene. Upon his arrival, Callanan noted a ligature around the victim's neck, abrasions on her left arm, and a laceration on her face. These abrasions suggested to him that the body had been dragged.

Dr. Sunandan Singh, the Bergen County Medical Examiner, also came to the scene. Dr. Singh pronounced the woman dead at 2:45 p.m., and based on his evaluation of the body at the scene, he opined that the woman had died between 2:00 p.m. and midnight the previous day.

A search of the area around the body did not result in any identification for the victim but did reveal several yellow grocery-type plastic bags. It was later learned that these bags originated from a grocery store in Queens.

Further investigation revealed that a man named Jorge Onofre had brought a group of men from Queens to the Gilmont Warehouse with the task of cleaning out the warehouse. This crew had worked at the warehouse about six weeks earlier. The police obtained a list of the workers that Onofre had brought to the site. Defendant and Armando, the victim's nephew, were both on the list of individuals who had previously worked at the warehouse.

On the following evening, Tuesday, September 15, 1998, officers from the BCPO went to Queens to question defendant and some of the other individuals who had worked at the Lyndhurst warehouse. The police were especially interested in defendant because they had learned, through another worker, that defendant's wife had been missing since Sunday, September 13, 1998.

Shortly before midnight on September 15, Detective Joseph Macellaro of the BCPO and Detective Peter Ortega of the New York [C]ity Police Department went to defendant's residence, Apartment 9B at 2513 31st Avenue, Astoria, Queens. When defendant opened the door, Detective Ortega, acting as interpreter, informed

defendant they wanted to speak with him regarding his wife's disappearance and asked to see a photograph of her. Defendant produced his wife's passport and agreed to accompany the officers to the precinct. The officers transported defendant and Armando to the local precinct.

At the precinct, defendant and Armando were interviewed separately, and after he was advised of his *Miranda* [FN 1] warnings, defendant agreed to speak with the police. Initially, defendant told police his wife and David Alvarez had argued on Sunday, and she had "stormed out" of the apartment and had not returned. Afterwards, he had searched for her by bicycle, but had been unable to locate her. Defendant explained he did not report his wife missing because he assumed she would return on her own.

[FN 1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Detective Macellaro told defendant he did not believe him. In response, defendant stated his wife had been out drinking all night, before returning home early in the morning. He also indicated he had an argument with her that almost turned physical, but her nephew Armando interceded. Defendant told Detective Macellaro that his wife had also argued with David Alvarez and, thereafter, she "stormed out" of the apartment and had not returned.

Macellaro told defendant they had discovered a woman's body behind the warehouse in Lyndhurst where defendant had worked, and they believed it to be his wife. According to Macellaro, defendant did not react with any obvious emotion to this news.

After again telling defendant he was having a hard time believing his story, Macellaro speculated aloud that defendant and his wife had argued because she was planning on leaving him. Defendant denied having anything to do with his wife's disappearance, but he admitted his wife was planning to leave him, and he was upset about that because he did not want her to leave him and the children.

Just before 3:00 a.m., Detective Luis Alvarez of the BCPO entered the interview room and asked defendant for consent to search his apartment. Defendant consented to the search, and he read and signed a Spanish version of a consent-to-search form at approximately 2:57 a.m.

Thereafter, Detective Macellaro continued to tell defendant he did not believe him, the police were going to find out the truth, and it would be in his best interest to tell the truth. At this point, defendant started crying and he blurted out (in Spanish), "I didn't want it to happen, it had to happen." Detective Macellaro then asked defendant if he had killed his wife, and he answered "yes."

After allowing defendant a few moments to compose himself, Macellero asked defendant to describe the events of Sunday, September 13, 1998. Defendant began by stating that his wife had been out drinking all night the previous evening, and they argued when she returned. During the course of their argument, Amalia accused defendant of having a girlfriend in New Jersey. Defendant denied the accusation, and offered to take Amalia to the site where he had worked in New Jersey. At about 11:00 a.m., they took a train to the Port Authority Bus Terminal where they boarded a bus to New Jersey. They arrived at the warehouse in Lyndhurst at approximately 12:30 or 1:00 p.m. The warehouse was closed, and the two argued as they proceeded towards the rear of the building. While they were arguing, defendant slowly grabbed his wife around the neck and began to choke her with his hands until she fell to the ground. Once she fell to the ground, he picked up an elastic strap that was lying on the ground and wrapped it around her neck, and he applied pressure. Defendant stated he held the strap for approximately five to ten minutes until his wife stopped moving or breathing. Defendant then tied the strap in a knot around her head and, when he realized his wife was dead, he covered the upper portion of her body with a blue plastic container top.

Defendant walked back to the bus stop, and he went into a nearby liquor store to purchase a return ticket to New York and a beer. While waiting for the bus,

defendant returned to the liquor store, inquired about the bus, and purchased a second beer, which he drank before returning home. Defendant told the police that later in the evening, he and Armando went to visit a friend named Felipe, and outside of Armando's presence, defendant told Felipe he had killed his wife. The next day, he twice telephoned a former coworker, on a pretext, in an effort to obtain information regarding the police investigation.

While waiting for a stenographer to be available, the police reviewed defendant's statement with him a second time. Between 5:48 a.m. and 6:45 a.m. on September 16, 1998, with the aid of a Spanish interpreter, defendant gave a twenty-four page stenographic statement. In his statement, defendant described how he killed his wife at the deserted warehouse in Lyndhurst:

> Question: Did a fight start between the two of you?
> Answer: Yes, then we started to argue because she told me that if I arrived home drunk she was going to kill me.
> Question: Did the fight turn physical?
> Answer: Yes, She told me that, then I told her why you telling me lies.
> Question: Did you touch your wife?
> Answer: I slowly grabbed her from the front.
> Question: When you say you grabbed her what part of her body did you grab?
> Answer: The neck.
> Question: Did you grab her throat with two hands or one hand?
> Answer: First I believe it was one, then with two
> Question: So you were choking her with two hands. Is that correct?
> Answer: When she was on the floor.
> Question: So she fell on the floor?
> Answer: Yes, she fell on the floor.
> Question: Then what happened?
> Answer: I grabbed her there with that elastic. I grabbed that elastic, I gave it a turn, I held it.

Question: When you say elastic what are you talking about something like a rope?

Answer: It was something like this but it stretched.

Question: Let the record reflect he is pointing to the strap which is on the stenographer's case. How long was this piece of strap?

Answer: I just know that I stretched it and it stretched long.

Question: Where did you get this from?

Answer: It was lying on the floor.

Question: And you said – did you wrap it around your wife's neck?

Answer: Yes.

Question: How many times did you wrap it around her neck?

Answer: I believe it was two times.

Question: Then what did you do after you had it wrapped around her neck? What did you do? Did you put pressure on it, did you squeeze?

Answer: I grabbed her neck and I used that elastic.

Question: How long did you hold the elastic around her neck for?

Answer: Like five, 10 minutes. It seemed like five minutes.

Question: What happened next? What happened to her?

Answer: She stayed there.

Question: Was she trying to pull the elastic off while you were holding it on her neck?

Answer: Yes, she was trying to but she couldn't because she grabbed me by my right arm and made these marks.

Question: Let the record reflect he's pointing to a contusion on his right arm that he indicated was done by his wife. And just to clarify how did you get that bruise on your right arm?

Answer: She grabbed me like this and I pulled away.

Question: So she grabbed your arm. Is that correct?

Answer: She was trying to grab me, but I didn't allow her to.

Question: Was she on the ground when you were holding this against her?

Answer: Yes, she was on the floor.

Question: Was she close to the building?

Answer: In the corner.

Question: Did there come a time when she stopped moving or stopped breathing?

Answer: I believe she stopped breathing because she fell back.

Question: . . . Just so I understand, your wife is on the ground and you have this elastic around her neck. Is that correct?

Answer: Yes.

. . . .

Question: So there comes a point in time you tied a knot in the elastic?

Answer: I said when she was face down.

Question: And you turned her on her back?

Answer: I tied it. I turned her over face up and I lifted her arms.

Question: When you turned her on her back was she breathing?

Answer: I don't think so because she wasn't breathing.

Question: After you did this what did you do? Did you put anything over her to cover her?

Answer: Oh yes. I put plastic there. It was covering sand that was on the ground.

Defendant was arrested after he gave his stenographic confession. Following his arrest, defendant was examined for injuries. The only injury observed was the contusion on his arm, which defendant said was caused by his wife grabbing him while he was strangling her.

While defendant was giving his statement to Macellaro, other police officers conducted a consent search of defendant's apartment. As a result of the search, the police seized a backpack from the room shared by defendant and his family. The contents of the backpack included several tools and a workman's

black back-support belt. Because the workman's belt bore visual similarities to the elastic used to strangle defendant's wife, and the ligature appeared to be the missing strap from the shoulder harness of the back-support belt, both items were submitted to the State Police laboratory for microscopic analysis. At trial, the State produced testimony that the fiber content and weave pattern of the two items exhibited the same characteristics, and that the clip fastener on the back-support belt fit the clip on the ligature.

On Thursday, September 17, 1998, following an extradition hearing, defendant was transported from Queens to New Jersey by police officers. During this ride, defendant, for the first time, mentioned that he and his wife had had a physical altercation. Also during this ride, defendant agreed to show the officers the route he and Amalia took to and from the warehouse.

At trial, the State produced the testimony of Pedro Soto, who had worked at the warehouse in Lyndhurst with defendant. He testified that, when defendant worked at the warehouse, he wore a black back-support belt around his waist made from "stretchable cloth material." In addition, when he was asked if he recognized the black back-support belt that had been seized by the police, he testified it was "very similar to the one [defendant] used to wear." This information was confirmed by Armando, who also testified he saw defendant wearing a black back-support belt at work.

Michael Manzo, a Lyndhurst resident, was another State's witness. He testified that on the Sunday in question, he had been standing outside of his house when a man and woman, who appeared to be Mexican, walked by. According to Manzo, the man was "at least eight steps" ahead of the woman, and the man "looked like he was really angry." On September 23, 1998, Manzo was shown a photograph of defendant, and he identified him as the man he had seen walk by his house. Manzo testified he contacted the police when he learned that the body of a Mexican woman had been found "down the street."

Dr. Singh, the Bergen County Medical Examiner, also testified at trial. Dr. Singh stated when he initially examined the victim's body at the warehouse in Lyndhurst, he saw some injuries on her face and "some abrasions," but "the most remarkable thing" he observed "was a ligature around her neck," which he described as follows:

> [P]art of the ligature had passed through the mouth, and it was wove very tightly around her neck as well as the mouth. And also after further examination it appeared that there were – the whole ligature itself was tied behind the back. And in doing so, apparently her hair had been caught in that knot, and it was implicated in that.

According to Dr. Singh, a black elastic belt had been used to cut off the victim's oxygen supply. Dr. Singh testified that because of the "elastic nature" of the ligature, it has been "tightly wound, both around the neck as well as the mouth. It was extremely tight." Dr. Singh determined the cause of death was "asphyxia due to ligature of [the] neck."

In response to a hypothetical question, Dr. Singh opined if an asphyxiation took place over a five to ten minute period, the victim would not be acting passively, but rather, struggling against the asphyxiating force. Dr. Singh also testified a knot in the rear of a ligature would likely have been tied when the person being strangled was unconscious.

Dr. Singh's examination also revealed blunt force injuries to the victim's head and neck. The majority of those injuries were located on the left side of Amalia's forehead above the ear. According to Dr. Singh, these injuries could have been caused by a hard object hitting Amalia's head or by her heard hitting a hard object.

Defendant elected not to testify at trial, and no witnesses were produced on his behalf.

(Dkt. No. 10-3 at pp. 3-16.)

On direct appeal, the New Jersey Superior Court, Appellate Division affirmed the conviction but remanded the matter for resentencing. (*See* Dkt. No. 10-3.) The New Jersey Supreme Court denied Mr. Rivera's petition for certification on his direct appeal. *See State v. Rivera*, 193 N.J. 221, 936 A.2d 968 (2007).

Mr. Rivera also filed a petition for post-conviction relief ("PCR") in the Superior Court. The Superior Court denied the PCR petition (Docket No. 10-31) and the Appellate Division affirmed. (Docket No. 10-9) On January 13, 2012, the New Jersey Supreme Court denied certification on Mr. Rivera's appeal from denial of his PCR petition. *See State v. Rivera*, 209 N.J. 97, 35 A.2d 680 (2012).

On May 7, 2012, Mr. Rivera filed this federal habeas petition. Respondents answered the petition on December 31, 2012. The matter is now ripe for adjudication.

### III.  HABEAS CORPUS LEGAL STANDARD

An application for a writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Because Mr. Rivera filed this petition for a writ of habeas corpus after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *See* Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996); *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

Thus a federal court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, - U.S. -, 131 S. Ct. 1388, 1398 (2011). The petitioner carries the

burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, - U.S. -, 131 S. Ct. 770, 784-85 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

## IV. DISCUSSION

### A. Claim I – Ineffective Assistance of Counsel

In Claim I, Mr. Rivera argues that his trial counsel was ineffective for failing to call him as a witness at a pretrial suppression hearing. Mr. Rivera faults counsel because Rivera allegedly was never informed that he had a right to testify, and would have done so if he had known that he had that right. (*See* Docket No. 1 at pp. 18-19.) Furthermore, Mr. Rivera argues that his trial

counsel told him not to testify at trial and he was unaware that he could

override his attorney's decision. (*See id.* at p. 19.) The last reasoned decision

on this claim came from the Appellate Division on Mr. Rivera's appeal from

denial of PCR. There, the Appellate Division analyzed these issues as follows:

> Under the Sixth Amendment of the United States
> Constitution, a person accused of crimes is guaranteed
> the effective assistance of legal counsel in his defense.
> *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.
> Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). To
> establish a deprivation of that right, a convicted
> defendant must satisfy the two-part test enunciated in
> *Strickland* by demonstrating that: (1) counsel's
> performance was deficient, and (2) the deficient
> performance actually prejudiced the accused's defense.
> *Ibid.* The *Strickland* test has been adopted in New
> Jersey. *State v. Fritz*, 105 N.J. 42, 58 (1987). *See also*
> *State v. Allegro*, 193 N.J. 352, 366 (2008); *State v.*
> *Loftin*, 191 N.J. 172, 197-98 (2007). In reviewing such
> claims, we apply a strong presumption that defense
> counsel "rendered adequate assistance and made all
> significant decisions in the exercise of reasonable
> professional judgment." *Strickland, supra,* 466 U.S. at
> 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695.
> "[C]omplaints 'merely of matters of trial strategy' will
> not serve to ground a constitutional claim so
> inadequacy . . . ." *Fritz, supra,* 105 N.J. at 54 (quoting
> *State v. Williams*, 39 N.J. 471, 489, *cert. denied*, 374
> U.S. 855, 83 S. Ct. 1924, 10 L. Ed. 2d 1075 (1963),
> *overruled in part on other grounds by, Stat v. Czachor*,
> 82 N.J. 392, 402 (1980)); *see also State v. Perry,* 124
> N.J. 128, 153-54 (1991).
>
> In assessing the first prong, we must determine
> whether counsel's conduct "fell outside the wide range
> of professionally competent assistance considered in
> light of all of the circumstances of the case." *State v.*
> *Castagna*, 187 N.J. 293, 314 (2006) (citation and
> internal quotation marks omitted). As noted, in
> considering the conduct of counsel, there is a strong
> presumption that such conduct "falls within the wide
> range of professional assistance." *Ibid.* (citation and

internal quotation marks omitted). Defendant must demonstrate that counsel's action "did not equate to sound trial strategy." *Ibid.* (citation and internal quotation marks omitted). As the Court observed:

> an otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with his or her counsel's exercise of judgment during trial. The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt. As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of a fair trial.
>
> [*Allegro, supra,* 193 N.J. at 367 (quoting *Catagna, supra,* 187 N.J. at 314-15) (citations, internal quotation marks and editing marks omitted).]

The second prong of the *Strickland* test requires that "prejudice must be proved; it is not presumed." *Fritz, supra,* 105 N.J. at 52 (citing *Strickland, surpa,* 466 U.S. at 692-93, 104 S. Ct. at 2067, 80 L. Ed. 2d 696-97). To prove prejudice, defendant must show the "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Ibid.* (quoting *Strickland, supra,* 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698). *See also State v. Gaither,* 396 N.J. Super. 508, 513-14 (App. Div. 2007), *certif. denied,* 194 N.J. 444 (2008); *State v. Rountree,* 388 N.J. Super. 190, 206-07 (App. Div. 2006), *certif. denied,* 192 N.J. 66 (2007).

Here, defendant claims counsel was ineffective in not fully advising him of his right to testify at trial or the suppression hearing. As to the suppression hearing,

the record is devoid of evidence suggesting that
defendant was not advised of his right to testify. A
review of the entire record reveals that trial counsel
developed a sophisticated attack on the confession
including presenting expert testimony. Counsel made
a strategic decision, and defendant's testimony at the
suppression hearing, a rare occurrence in any event,
would have provided substantial discovery
opportunities for the prosecution. We find no basis for
concluding that counsel was ineffective; moreover, the
confession was not the sole basis for defendant's
conviction. He had told a friend of his guilt and offered
to lead police along the route that he had taken on the
day of the murder.

(Dkt. No. 10-9 at p. 8-11.)

The State court correctly articulated the law governing a federal

constitutional claim of ineffective assistance of counsel. *Strickland v.*

*Washington*, 466 U.S. 668 (1984).

First, *Strickland* requires that the petitioner show that counsel's

performance was deficient, *i.e.,* that it fell below an objective standard of

reasonableness. *See id.* at 688; *see also Ross v. Varano*, 712 F.3d 784, 798 (3d

Cir. 2013). Petitioner must identify the particular acts or omissions that are

alleged to have been deficient. *See Strickland*, 466 U.S. at 690. The federal

court must then determine whether, in light of all of the circumstances, the

identified acts or omissions fell outside the wide range of professional,

competent assistance. *See id.*

Second, *Strickland* requires that a petitioner affirmatively show prejudice,

*i.e.*, that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland,* 466 U.S. at 697).

Mere *Strickland* error is not sufficient to require habeas relief under AEDPA. In assessing an ineffective assistance of counsel claim on habeas,

> [t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington,* 131 S. Ct. at 785 (internal quotation marks and citation omitted) (emphasis in original).

Mr. Rivera first argues that counsel was ineffective because he failed to advise Rivera of his right to testify at the pretrial suppression hearing. The Court finds that the state courts' denial of this claim was not an unreasonable application of the *Strickland* standard.

As to this claim, the Appellate Division's discussion implicates both the deficient-performance and the prejudice prong of Strickland. Reviewing the suppression hearing, the state court found that counsel developed a "sophisticated attack" on the confession. I note that the suppression hearing occupied five days, far beyond the norm. (Docket 10-9 at 3; *see also* transcripts, Docket 10-14 through 10-20.) Trial counsel extensively cross examined the police officers and brought out circumstances that might have cast doubt on the confession. Going beyond the norm, defense counsel introduced expert psychological testimony, as the state court noted. (Docket 10-9 at 11). This counsel did in an attempt to establish that Rivera was mentally incapable of effectively waiving his rights. (Docket 10-16, 10-18, 10-19) The state court, more experienced in matters of state procedure than this one, also noted that a defendant's testimony at a suppression hearing, far from being a routine feature of professionally competent representation, would have been "a rare occurrence." Indeed, especially given the availability of alternative evidence, it was a reasonable strategic decision to keep defendant off the stand, because Rivera's testimony might have provided "substantial discovery opportunities for the prosecution." (Docket 10-9 at 11). The trial court judge made careful findings that established the voluntariness of the confession, as

well as substantial compliance with the Vienna Convention, *see infra.* (Docket 10-20 at 24 et seq.) These were upheld by the PCR judge, and on appeal. In short, the state court's finding that defense counsel's performance did not deviate from professional standards was legally sound; it was a reasonable conclusion from the evidence before the court; and it certainly was not an unreasonable application of the deficient-performance *Strickland.*

As for the prejudice prong, the state court correctly noted that, to show prejudice, Mr. Rivera would need to establish that, but for counsel's errors, he would have testified at the suppression hearing and his testimony would, to a reasonable probability, have changed the outcome of the proceedings. Mr. Rivera states that he would have testified if counsel had told him he had the right to do so. (*See* Dkt. No. 1 at p. 19.) Furthermore, he states that his testimony would have established that he did not read, write or understand English, and was unable to comprehend the waiver forms that he signed.

The state court found no evidence in the record of the suppression hearing or the PCR proceeding to suggest that defendant was not advised of his right to testify. (Docket 10-9 at 11) At any rate, counsel was able to fully explore the factual circumstances surrounding the motion to dismiss through the testimony of other witnesses. At the suppression hearing, the court heard expert testimony that Rivera "didn't comprehend what was being . . . told him. That essentially, had he comprehended, that he – whatever he was going to say was going to be used against him, he wouldn't have made those statements." (Dkt. No. 10-19 at p. 7.) Evidence of Rivera's lack of language ability and lack

of mental capacity to make an informed waiver was placed before the court through psychological expert testimony. Rivera's own testimony would therefore have been largely cumulative. Moreover, it would have carried the disadvantage of exposing Rivera himself to cross-examination or disclosing his position before trial. The court accepted other evidence, for example from the Spanish-speaking officers who interviewed Rivera, that he well understood what was going on.

Finally, as the court noted, even assuming that any error occurred, other evidence independent of Rivera's confession was strongly corroborative of guilt, further lessening the possibility of prejudice. By way of example only, upon being transferred back to New Jersey after his extradition hearing in New York on September 17, 1998, Mr. Rivera showed police the route he took to the Lyndhurst warehouse with his wife on the date of her murder. (*See* Dkt. No. 10-27 at p. 7.) Additionally, other witnesses, such as Michael Manzo, placed Mr. Rivera at or near the Lyndhurst warehouse at the time of the murder. (*See* Dkt. No. 10-25 at p. 6-9.) Scientific evidence linked the ligature found on the victim to Mr. Rivera's work belt.

Accordingly, the state court did not unreasonably apply *Strickland* when it denied relief on the portion of Mr. Rivera's ineffective assistance claim that relates to the suppression hearing.

Mr. Rivera asserts a similar claim of ineffective assistance at trial, as opposed to the suppression hearing. That is, he claims he did not know he had a right to testify at trial and could have overridden his counsel's advice not to

do so. As the state court found, the record plainly contradicts Mr. Rivera's contentions.

The following colloquy took place at trial between the trial judge, Mr. Rivera and his trial counsel, Mr. Weichsel:

> THE COURT: The next question is will [Mr. Rivera] testify?
> MR. WEICHSEL: I believe not. I'd like to – can I use the interpreter for one second.
> THE COURT: Yes.
> (Counsel and client confer)
> . . . .
> MR. WEICHSEL: Okay. Well, do you want me to voir dire him?
> THE COURT: I would like to have you voir dire him, and then I might fill in some questions where I need to.
> MR. WEICHSEL: Okay. Fine.
> THE COURT: Mr. Rivera, stand please. [¶] Mr. Rivera, do you understand that under the Constitution of the United States and the Constitution of the State of New Jersey you have an absolute right either to testify on your own behalf or to choose not to testify and to remain silent. If you choose not to testify and remain silent the jury is not permitted to draw an adverse inference by virtue of the fact that you did not testify. [¶] Do you understand what I just told you?
> THE DEFENDANT: Yes. Well, but there are things I guess I am saying that it was not my intention to commit that crime and I would like to talk also because my desire was not to leave my house and to abandon my children, that's why I didn't leave my wife so I wouldn't leave my children abandoned because I knew that my children were going to suffer if I left the house.
> THE COURT: Mr. Weichsel, I would like just the area whether he wanted to testify or not.
> MR. WEICHSEL: Judge, that's all I asked him. [¶] Mr. Rivera, we're here today, right now, is for you to tell Judge Conte whether you want to testify on your own behalf in this trial. You've got to understand if you testify on your own behalf, whatever your testimony is will be subject to cross-examination by Mr. Santulli.

You're not permitted to make a statement to the jury. You would only be able to – you're permitted to testify in question and answer form, and as I advise you before if you don't testify then the jury can draw no adverse inference based on the fact that you didn't testify, and as I also told you before whether you – despite my advice whether you choose to testify or not is a right that is personal to you and only you can make that decision. And the whole purpose of this hearing right now is for you to tell Judge Conte whether you want to testify in front of a jury or whether you don't.

THE DEFENDANT: But I don't really know the law and I'm depending on him. If he tells me to be silent then I'm silent, but if he gives me the opportunity to speak then I will do it.

THE COURT: You're not making it easy. [¶] Mr. Rivera, you have a right to take the stand and testify. Do you understand that?

THE DEFENDANT: The witness stand, what is that?

MR. WEICHSEL: Right up there.

THE COURT: Here.

THE DEFENDANT: Well, I could go to the witness stand and testify, but if he's advising me to be quiet then I will be quiet.

THE COURT: Do you understand that it's your decision to make whether you want to testify in this case or not?

THE DEFENDANT: To give testimony? To give testimony?

THE COURT: Yes.

MR. WEICHSEL: That's what we've been talking about for the last 15 minutes.

THE DEFENDANT: To be honest I don't have an opinion.

THE COURT: Do you have any other questions you want to ask your attorney?

THE DEFENDANT: Well, I will need to talk to him. There are a lot of questions. For instance, what the detectives had testified to not everything happened that way.

THE COURT: I guess the only thing I need to know from Mr. Rivera if he wants to take the witness stand and have his attorney ask him questions.

THE DEFENDANT: Honestly, I don't know.

THE COURT: Once he takes the witness stand the State, Mr. Santulli has a right to ask him questions.

THE DEFENDANT: Well, if I'm asked questions then I will answer.

MR. WEICHSEL: Well, Judge let me put it another way. [¶] Mr. Rivera, we've discussed you testifying both here in court and over at the jail. Isn't that correct?

THE DEFENDANT: Uh-huh.

MR. WEICHSEL: And has my consistent advice to you that as your attorney I've advised you for the reasons best known to myself which we've discussed that you ought not to take the witness stand?

THE DEFENDANT: Uh-huh.

MR. WEICHSEL: And has it been my consistent advice for a long time.

THE DEFENDANT: Yes, that's the way that he has told me.

MR. WEICHSEL: Now, Mr. Rivera, you're free to accept or reject that advice. Do you wish to accept my advice and not testify or do you wish to testify?

THE DEFENDANT: No, I will leave it like this better.

THE COURT: Okay. I will take it that he does not want to testify based upon his attorney's advice.

(Dkt. No. 10-27 at p. 78-82.)

As the above colloquy indicates, Mr. Rivera was advised in open court by his attorney that it was his decision whether or not to accept his advice and testify at trial. Mr. Rivera's argument that he was not so advised, and did not know he could opt to testify, is without merit. The state court so found, and I have no basis to abandon my deference to such a finding; it is not an unreasonable determination of the facts in light of the evidence presented in state court. Indeed, it is virtually the only possible conclusion from this record. The state court did not unreasonably apply the *Strickland* standard here. This component of Mr. Rivera's ineffective assistance claim, like the other, does not merit federal habeas relief.

Accordingly, I will deny Mr. Rivera's petition for habeas relief on Claim I, ineffective assistance of counsel.

B. Claim III – Right to Testify at Trial

In Claim III, Mr. Rivera asserts that he was deprived of his right to testify on his own behalf at trial: specifically, that "[t]rial counsel told defendant not to testify at trial, and defendant was unaware of the fact that he could override that decision." (Dkt. No. 1 at p. 21.) Essentially, this is a substantive version of the claim brought *via* ineffective assistance of counsel, discussed in the preceding section.

The Appellate Division summarily denied this claim on appeal from the denial of PCR. That denial is considered a decision on the merits; like the ineffective assistance claim, this related right-to-testify claim is therefore subject to AEDPA, rather than *de novo,* review. *See Harrington*, 131 S. Ct. at 784-85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state law procedural principles to the contrary."). This Court therefore must look, not just for error, but for an unreasonable application of Supreme Court precedent.

"The right to testify on one's own behalf at a criminal trial is undoubtedly a constitutional right." *United States v. Rahamin*, 168 F. App'x 512, 519 (3d Cir. 2006) (citing *Rock v. Arkansas*, 483 U.S. 44, 51 (1987)). "The right is personal and thus only the defendant may waive it." *United States v. Pennycooke*, 65 F.3d 9, 10 (3d Cir. 1995) (citations omitted); *see also Donna v.*

*United States*, No. 10-1607, 2011 WL 322636, at *5 (D.N.J. Jan. 31, 2011) ("The decision whether to testify is a 'fundamental' litigation decision not left solely to counsel's professional judgment, and is for the client to make.") (citing *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996)). "As a constitutional right essential to due process of law in a fair adversary process, a defendant's waiver of the right to testify must be knowing and intelligent." *Pennycooke*, 65 F.3d at 11 (internal quotation marks and citations omitted); *see also Donna*, 2011 WL 322636, at *5.

The peculiar quality of the right to testify, however, is that it is the mirror image of another constitutional right: the Fifth Amendment right to remain silent. Every defendant who goes to trial must do one or the other. A defendant cannot do one without waiving the other. Thus there is nothing inherently suspect about the choice of either alternative. Nevertheless, many courts have adopted the practice of ensuring that the defendant's decision is placed on the record. And the trial court, as we have seen, did that here.

In Part IV.A, *supra*, pp. 21-23, this Court quoted an extensive colloquy involving trial counsel, the trial judge, and Mr. Rivera, aimed at determining whether Mr. Rivera wished to testify at trial. At the prompting of the trial judge, trial counsel explicitly told Mr. Rivera on the record that the decision whether to testify was personal to him and that he was free to reject his counsel's advice that he not testify. When Mr. Rivera gave equivocal answers, both the trial judge and counsel probed further, until they were satisfied that they had a

definitive answer from him. Ultimately, Mr. Rivera stated that he did not want to testify.

Given this record, I could not possibly find that the state court(s) unreasonably applied clearly established federal law or arrived at a decision that was based on an unreasonable determination of the facts based on the record before them. Mr. Rivera was informed of his right to testify, and he made a free, voluntary decision to rely on his attorney's strategic advice that he stay off the witness stand.

## C. Claim II – Vienna Convention on Consular Relations

In Claim II, Mr. Rivera argues that, because he is a Mexican national, upon his arrest, the Mexican Consulate should have been notified under the Vienna Convention on Consular Relations. That, he says, "would have led petitioner to request Spanish speaking counsel in light of the magnitude of the charges pending against him, and the time he was facing." (Dkt. No. 1 at p. 20-21.)

As to this claim, the trial court made a full record in connection with a five-day suppression hearing and made reasonable factual findings contrary to Rivera's position. (Docket 10-14 through 10-20). The last reasoned decision on this claim came from the Superior Court, Law Division, Bergen County, during Mr. Rivera's PCR proceedings. That court's oral opinion on the record stated, in part:

> [T]he issue with respect to the Vienna Convention on consular relations. There is nothing. In fact, it's contrary to the record to indicate that this defendant wasn't aware of that circumstance. This particular

defendant, in my opinion, based on the testimony from the New York City detective, whose name I believe is Ortega, and also from someone from the Prosecutor's Office, is that Mr. Rivera was notified of his consulate rights to not want the Mexican Consulate notified, and he circled "no" on the rights form when asked if he wanted notification.

Nevertheless, there was even testimony that Detective Palotta – that's the gentleman from the Prosecutor's Office – followed his training and actually made a notification anyway because the victim was also Mexican, and the treaty requires notification when a murder victim is also a foreign national.

The record is complete on all fours and in all corners with the fact that this individual – this defendant – was entitled to and did receive all the rights that he was accorded under that Vienna Treaty/Convention. There's nothing to indicate that he was misled or otherwise did not receive the consulate notice.

(Dkt. No. 10-31 at pp. 9-10.) The "testimony" and the "record" referred to are the record of the five-day suppression hearing.

The United States is a signatory to the Vienna Convention on Consular Relations and Optional Protocol on Disputes ("Vienna Convention"), Dec. 14, 1969, 21 U.S.T. 77, T.I.A.S. No. 6820. Article 36 of the Vienna Convention provides as follows:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

    (a) Consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) If he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) Consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this article are intended.

21 U.S.T. 77.

   In *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 343 (2006), the United

States Supreme Court assumed, without deciding, that the Vienna Convention

granted individuals enforceable rights. *Sanchez-Llamas* thus left the question

open, and "[t]he circuits disagree as to whether the Vienna Convention creates enforceable individual rights." *Huggins v. Kerestes*, No. 12-3655, 2013 WL 5405320, at *4 (E.D. Pa. Sept. 26, 2013) (*comparing Osagiede v. United States*, 543 F.3d 399 (7th Cir. 2008), *with Mora v. State of New York*, 524 F.3d 183, 196 (2d Cir. 2008)). In this case, I may assume without deciding that the Vienna Convention creates enforceable individual rights. Even on that favorable assumption, Mr. Rivera has failed to show that he is entitled to federal habeas relief on this claim.

The Superior Court made the factual determination that Mr. Rivera waived his consulate notification rights. Furthermore, the Superior Court made the factual finding that the Mexican Consulate was in fact notified of Mr. Rivera's arrest. Under AEDPA, these factual determinations are presumed correct.

Mr. Rivera fails to show by clear and convincing evidence—or even to suggest that any such evidence exists—that his contentions are true, and that the Superior Court's factual determinations were in error. At the suppression hearing, Detective Ortega testified that Mr. Rivera waived his right to consular notification. (*See* Dkt. No. 10-15 at p. 33.) Detective Palotta similarly testified at the suppression hearing that Mr. Rivera waived his right to notification. (*See* Dkt. No. 10-17 at p. 9.) Nevertheless, despite Mr. Rivera's waiver, Detective Palotta attempted to notify the Mexican Consulate on September 16, 1998, the day of Mr. Rivera's arrest. He was unable to get through that day, but he did notify the Mexican Consulate in Philadelphia of Mr. Rivera's arrest on the

following day, September 17, 1998.[2] (*See id.* at pp. 11-12.) At the suppression

hearing, the trial court heard the witnesses, made credibility determinations,

accepted this testimony and found it to be true. (Docket 10-20 at pp. 30-34).

I find that these factual findings, later reaffirmed by the PCR court, are

firmly rooted in the evidence of record. They do not constitute an unreasonable

determination of the facts in light of the evidence presented in state court. And

having made these factual findings the Superior Court necessarily held as a

matter of law that Mr. Rivera had received everything to which he was entitled

under the Vienna Convention.

Not only Mr. Rivera waive those rights; an officer notified the Mexican

Consulate of his arrest anyway. Accordingly, Mr. Rivera fails to show that the

state court's denial of this claim was a decision based on an unreasonable

application of federal law or an unreasonable determination of the facts. Mr.

Rivera is not entitled to federal habeas relief on this claim, and I deny his

petition on this ground.

D. Claim IV – Suppression of Evidence

In Claim IV, Mr. Rivera argues that all of the statements he made to the

police should be suppressed for the reasons stated in Claims I and II. This

amounts to an argument that all such statements are fruits of the violations

---

[2]     In her concurring opinion in *Sanchez-Llamas*, 548 U.S. at 362, Justice
Ginsburg noted that Article 36 of the Vienna Convention "does not require the
arresting authority to contact the consular post instantly."  Justice Ginsburg cited to
the International Court of Justice which had found that notification within three days
satisfied Article 36's "without delay" requirement, and the United States Department of
State website which directed authorities to notify the appropriate consular post within
twenty-four, and certainly within seventy-two, hours. *See id.* (citations omitted).

alleged in Claims I and II. This claim fails because its premise fails. As established in Part IV.A and C, *supra*, Mr. Rivera is not entitled to federal habeas relief on Claims I and II. It therefore follows that Mr. Rivera's derivative claim for federal habeas relief in Claim IV must fail as well.

## V. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, the Court finds that a certificate of appealability should not issue in this case.

## VI. CONCLUSION

For the foregoing reasons, the habeas petition will be denied and a certificate of appealability shall not issue. An appropriate order will be entered.

Dated: October 30, 2013

KEVIN MCNULTY
United States District Judge